SALLIE MARKER,

*vs.*

FRANK KELLY and WILLIAM MARKER.

*Kent, Jan.* 26, 1921.

In suit by daughter to set aside deed by her deceased father of a farm, which comprised substantially all his property, which he executed, a year before his death, in consideration of the grantee's undertaking to suport him until his death, evidence *held* not to show fraud, inducing the execution of the deed.

BILL TO SET ASIDE A DEED. The bill was filed for the purpose of setting aside and nullifying a deed made on April 19, 1918, by Wesley Marker to Frank Kelly, one of the defendants. The cause was heard on bill, answer of Frank Kelly, exhibits and testimony of witnesses heard orally before the Chancellor, and submitted for decision without oral argument or written briefs.

*Thomas C. Frame, Jr.,* and *John B. Hutton,* for complainant.
*James H. Hughes,* for defendant Frank Kelly.

THE CHANCELLOR. Sallie Marker, the complainant in the bill, seeks to have declared null and void a deed made on April 19, 1918, by Wesley Marker to Frank Kelly, one of the defendants, on grounds of incompetence of Marker to make it, and fraud and undue influence on the part of Kelly in securing it. The complainant and William Marker, one of the defendants, are children, heirs at law of, and only beneficiaries under a will made by, Wesley Marker on July 26, 1917. Prior to the execution of the deed in question, Wesley Marker was the owner of a farm containing about 36 acres of land, situate in North Murderkill hundred, against which there were liens consisting of two judgments aggregating $250. He was about 73 years old at the time of his death on April 2, 1919, had lived alone on the farm for a number of years, and owing to his advanced age and the condition of his health was unable to properly care for himself. The farm was substantially the only property owned by Marker at the time of the conveyance. The farm is described by one witness for the complainant, Luther Marker, as a "forest farm," containing between 30 and 40 acres of land, about one-half of which was cleared and had been tilled, but not for at least two years previous to

the conveyance, and the balance was woodland from which Wesley Marker during that time obtained sufficient means of support by cutting the timber and making railroads ties therefrom. The buildings on the farm were in a very poor state of repair. During the winter of 1917-1918 Marker was ill and unable to properly care for himself, and was visited once a day by his daughter, who took him food, and a part of the time a neighbor also took him food daily, whenever the weather permitted. His son and son-in-law at times provided him with firewood.

The greater portion of the testimony as to the mental incompetence of Marker to make the deed relates to this period, although testimony was introduced by the complainant to show the mental condition at other times during both of those years. The evidence as a whole, however, clearly shows that Marker was mentally capable at times of transacting business, and some of the acts and conversations testified to by witnesses on behalf of the complainant would so indicate. The testimony of Dr. Conwell, who visited Marker professionally on April 5, 1918, would indicate that, although Marker had suffered a severe illness, he answered the doctor's questions intelligently and attempted to perform acts which would indicate at least some ability to reason. The testimony of John D. Hawkins, a member of the Kent County bar, who was consulted by Marker and Kelly in reference to the preparation of the deed, was, in effect, that Marker, whom he had known for about 30 years, was mentally capable of transacting business that day, and said or did nothing to indicate otherwise; that Marker seemed to fully comprehend what was being done, and entered into the discussion of the plan and the best method of carrying it into effect. Marker had also intelligently discussed with his son, William Marker, and Mrs. Rosie McClain, a neighbor who had been looking after him somewhat, the same subject-matter prior to the execution of the deed, and according to their testimony understood the transaction. I am, therefore, of the opinion that at the time of the execution of the deed Wesley Marker was capable of comprehending, and did comprehend and undertand, the transaction, and the evidence of William Marker shows that thereafter Wesley Marker understood and realized what he had done, and expressed his satisfaction with it.

It also appears from the evidence that Wesley Marker, in making the deed, acted upon the suggestion of Mrs. McClain, after the complainant and William Marker had refused to properly provide and care for him. Kelly had temporarily been making his home with William Marker and keeping his horse in Wesley Marker's stable at the time Dr. Conwell visited Wesley Marker and advised the complainant and Mrs. McClain that Wesley Marker should receive better attention than they were able to give him. Upon the refusal of the daughter and son to take their father into their homes and look after him, Mrs. McClain suggested to Wesley Marker that he propose to Kelly that he (Kelly) come there, provide for and maintain him the balance of his life in consideration for the farm. Wesley Marker did make that proposition to Kelly, and after a discussion of it between Wesley Marker, William Marker, and Kelly, and William Marker approving of and consenting to it, it was agreed to.

In order to carry out the plan Wesley Marker and Kelly went to Dover on April 19, 1918, consulted John D. Hawkins, a member of the Kent County bar, in reference to the plan, and as a result the deed from Wesley Marker to Kelly was prepared and executed. At the same time, and at the suggestion of Mr. Hawkins, in order to secure to Wesley Marker a performance of the agreement on Kelly's part, a bond in the sum of $500 was given by Kelly to Wesley Marker, conditioned that—

"Frank Kelly, his heirs, executors or administrators, or any of them, shall and do well and truly support, clothe, board and generally maintain the said Wesley Marker, for and during the term of his natural life, and shall make and carry into effect proper interment of the body of the said Wesley Marker."

According to the testimony of Mr. Hawkins the amount of this bond was fixed after an estimate of the value of the farm above the liens had been discussed. Kelly immediately undertook to perform his part of the agreement by going on the farm to live, later employed a housekeeper and provided for Wesley Marker until he died on April 2, 1919.

From this it would appear that there was no effort on the part of Kelly to conceal the transaction; that he acted openly; and that William Marker, the son of Wesley Marker, was informed and approved of the plan before any attempt was made to carry

it into effect. There is also evidence to show that Sallie Marker, the complainant, knew of the existence of the deed very shortly after its execution, and that Wesley Marker thereafter expressed to his son, William Marker, his satisfaction with the arrangement.

From this state of facts I am constrained to hold that Wesley Marker was on April 19, 1918, capable of understanding and realizing what he was doing, and that in making the deed to Kelly he was not defrauded or unduly influenced. The bill of complaint should therefore be dismissed, with costs on the complainant.

A decree will be entered accordingly.